IN THE DISTRICT COURT OF DOUGLAS COUNTY, KANSAS
DIVISION THREE

FILED
DOUGLAS COUNTY
DISTRICT COURT
2011 OCT 17 A 10:55
BY_____ Me

Erika C. Waller,  )
   Petitioner,  )
                )
vs.  )      Case No. 2010-DM-870
                )
James D. Waller,  )
   Respondent.  )

## MEMORANDUM DECISION

This matter came before the Court on a hearing in a contested divorce on May 26 and May 27, 2011. Petitioner appeared by Margie Wakefield and Respondent appeared by John Gerstle. Both parties provided Local Rule 11 statements, domestic relations affidavits, and both presented evidence.

Summarizing the arguments, Mr. Waller contends that business has fallen off; he has no money and very little income; his assets are falling in value, and he is close to bankruptcy. At trial, Mr. Waller proposed that he take the majority of assets and debts including business debts, and Ms. Waller walk away with $30,000 in debt. It is true that Mr. Waller has guaranteed certain business loans, has liens on his assets, and has a poor credit rating. However, Mr. Waller has not filed for bankruptcy in the year this divorce has been pending despite his dire statements. He continues to operate his businesses.

Ms. Waller contends that Mr. Waller is not as badly off as he claims and requests property of approximately $343,476 to be awarded to her, as well as child support. She argued that Mr. Waller receives benefits beyond his taxable income shown in income tax returns. Ms. Waller testified that Mr. Waller bragged about successfully hiding his assets in his first divorce. She pointed out that Mr. Waller's spending habits have not changed over the pendency of the divorce, despite his claim of no earnings at this time. He takes his daughters out to eat; he had new furniture and TVs, new flooring, and new bunk beds for the daughter at home. Mr. Waller contended that he earned points on his business credit cards, which he in turn cashed in for gift cards from Lowe's and Pottery Barn and so forth, which paid for these items.

The truth of the matter is hard to nail down based upon the submissions of record. The Court has also considered what financial information the Respondent failed to furnish in this case. Significantly, Mr. Waller did not hand over all financial records to Ms. Waller so she could confirm for herself that his financial situation is dire. Indeed, he

did not hand over all financial records even after a court order to do so. Mr. Waller claimed that business financial records for calendar years 2006, 2007 and 2008 cannot and will not be produced since the books for these fiscal years "were not a good representation of the financial condition" of his businesses. (Court File: Letter from James Waller to District Court, April 18, 2011, with attachments from tax preparers and law firm of Lathrop & Gage). Although Mr. Waller's companies were grossing approximately $2.2 million to $3.8 million in receipts annually in those years, he blamed the poor quality of financial records for three consecutive years on an incompetent office manager who could not use Quickbooks correctly. Allegedly, the invoices, receipts and records that supported the Quickbooks data no longer exist. No accountant or tax preparer since then has seemingly been able to sort out the bookkeeping errors. The Court infers that more than a Quickbooks mistake is at play here.

Although Mr. Waller professed an unwillingness to perpetrate a fraud upon the court by producing inaccurate financial records, the Court notes that he has simultaneously adopted a more intransigent tone in dealings with Ms. Waller, declaring an unwillingness to "play ball, I will not provide anything without a court order." He called her a "ruthless bitch" who managed "to use me as a meal ticket for over 8 years." Pet. Exhibit 33, Notebook, e-mail from Jay Waller to Erika Waller. Nor did he produce the financial records for those years with a disclaimer so that Ms. Waller could make her own review and draw her own conclusions.

*Facts*

1. The parties were married on September 25, 1999, though Ms. Waller claimed that they cohabited and commingled finances since November 1997. The parties have one minor child who is 9 years old. Mr. Waller also had two children from a previous marriage, currently adults, whom Ms. Waller adopted. During most of the marriage, Ms. Waller ran the household and reared the children, while Mr. Waller traveled the country on business.

2. The petition for divorce was filed on August 20, 2010, which was used for the date of valuation, except when it was necessary to use the 2010 year end to ascertain the business entity information.

3. Mr. Waller was ordered to pay child support of $850.00 a month beginning December 8, 2010, as well as maintenance in the amount of $1,116.00 beginning December 8, 2010. Other than a mortgage payment of $1710.00 in December 2010, Mr. Waller did not pay maintenance or child support. He canceled Ms. Waller's health insurance coverage, which was later reinstated upon court order. In May, 2010, Mr. Waller was ordered to turn over the American Funds retirement account to Ms. Waller, equaling $9,126.00 to satisfy unpaid maintenance and child support. Taxes and penalties will be deducted from that amount.

4. Mr. Waller is 49 years old, healthy, and is self-employed. During the marriage, he received income from three different business entities; StagePro, Inc., StagePro Mobile,

LLC, and Apex, Inc. Respondent owned 100% of StagePro, Inc., a chapter S corporation, as of January 2010; 100% of StagePro Mobile, and 33% of Apex, Inc. StagePro, Inc. borrowed from StagePro Mobile at times but Mr. Waller never answered how much StagePro Inc. owed StagePro Mobile, saying it would all "wash" in the companies' 2010 merger (Exhibit 32). Mr. Waller testified that during the pendency of this case Apex, Inc. was dissolved.[1] Apex manufactured mobile stages for entertainment events, and according to Mr. Waller, the co-owner of Apex now owns all Apex's assets. Mr. Waller will receive a commission of $15,000 for every Apex unit he sells. Mr. Waller's other companies provide sound and lights to staging and roofing for entertainment festivals and events throughout the country. Total gross receipts for Mr. Waller's businesses remain approximately $1,500,000 to $2,000,000 annually, even with the downturn in the economy in 2008.

5. Ms. Waller is 36 years old and works at Corpus Christie Catholic School. She also works 14 hours per week at South Junior High School as a drama director. The two jobs bring in slightly less than $30,000 annually. Until 2007, she helped Mr. Waller with his company's bookkeeping.

6. Mr. Waller claimed that he is currently earning about $35,000 per year. However, he recently listed his annual income on Match.com as $100,000 to $150,000 (Pet. Exhibit 6). Mr. Waller dismissed his internet statement as "a lie" and pointed out that his promissory note with People's Bank limits his compensation to a $60,000 salary per year, not to be exceeded without the Bank's knowledge and express permission. The Court notes that during the marriage, Ms. Waller was paid $24,000 annually by his company for undisclosed work, which increased the family income to at least $84,000.

7. Mr. Waller also received and benefited from a number of personal expenses paid for by his company, including property and vehicle insurance, personal property taxes, cell phones, satellite TV, internet, health insurance, travel with no offset for personal expense, etc. In 2008 and 2009, Christmas gifts for the family were company expenses, and new golf clubs for employees were categorized as "advertising" expenses. He paid himself as "contract labor," in addition to his salary. His company purchased a John Deere Tractor for the home and wheel replacements for his son. Pet. Exhibit 3. Mr. Waller admitted that he had satellite reception at home, paid for by the company since he often worked at home. He had broadband internet service, and his company had 23-26 phone lines, so that free phones became a perk for his employees and himself. Mr. Waller admitted on cross-examination that perhaps he received as much as $10,000.00 in benefits per year, deducted as business expenses which upped his standard of living. Ms. Waller went through business bank statements and credit card statements and came up with at least double that amount. Pet. Exhibits 2 and 3.

8. In addition to all those enumerated company expenses, in 2008, Mr. Waller's petty cash fund at the company totaled $79,349.85. Mr. Waller conceded that this amount looked bad, but said petty cash was used primarily for unrecorded business expenses. His

---

[1] No documentation showing dissolution or a corporate winding up was turned over to Ms. Waller, and she testified that Apex still had an internet presence.

3

explanation about when and why he resorted to a petty cash categorization for this amount of money was not persuasive. Furthermore, he admitted that personal items such as clothing and family meals at restaurants came from "petty cash." In 2010, the "petty cash" fund had fallen, but it still constituted $15,390.13. Ms. Waller asks that the petty cash fund be considered and attributed to Mr. Waller as income in determining child support.

9. Ms. Waller also noted that Mr. Waller took depreciation on his equipment, which deductions reduced his taxable income. Mr. Waller conceded he took an "aggressive" approach to depreciation and that his equipment was still useable even when the book value was zero. Ms. Waller has asked that the Court consider whether he has understated his taxable income for purposes of child support.

*Assets and Liabilities*

10. The parties own a marital residence at 1712 Oakmont, Lawrence, KS 66047, which was appraised by the bank at the last refinancing at $265,000.00. The county tax appraisal currently listed the property at $213,000.00. The first mortgage balance is $186,000. However, the marital residence is now collateral for a consolidated bank loan with Peoples Bank, which subjected the Oakmont property to more debt and caused Ms. Waller to incur attorney fees. The parties are in agreement now that Mr. Waller should keep the marital residence and pay the accompanying mortgage.

11. Ms. Waller had $37,860.75 in credit card debt.[2] She testified that the purchases were for joint bills of the marriage, such as clothing for the children, food, fuel, and household items. When she married Mr. Waller, she had about $4,000.00 in debt, but she testified that $33,000.00 was marital debt. Mr. Waller asserted that she had $12,000 to $20,000 in pre-marital debt on credit cards. No documents were produced to resolve this issue.

12. Stage Pro Inc. owns 3196 Highway 68, Ottawa, Kansas, which is a building and approximately 30 acres. The last appraisal in 2009 was for $700,000, though Franklin County appraised it at $387,230 in 2010. (Court File: Letter from James Waller to Court on April 25, 2011). There is a mortgage of $435,887.00 on the commercial property, and the realty is listed as collateral for the Peoples Bank consolidated bank loan.

13. The couple own timeshares in Orlando, Florida; Daytona Beach, Florida; and Las Vegas, Nevada (StagePro, Inc.). Mr. Waller used those timeshares for business and vacation, since his employees and he could stay in the timeshares without paying hotel bills when traveling on business. Ms. Waller valued them at $36,500.00, but Mr. Waller valued them at considerably less than what he paid for them.

14. In September 2009, Mr. Waller applied for a bank loan with Peoples Bank which was to consolidate all loans with that bank. Consolidation of the loans also benefited him in that his loans would not fall under a monthly review. In a personal

---

[2] See Attachment to Amended DRA by Petitioner for a list of credit card debts.

4

financial statement in 2009, he listed his assets as $3,787,800, and his liabilities as $185,000. He "estimated" StagePro Inc., StagePro Mobile LLC and Apex Stages to be worth $3,500,000. Pet. Exhibit 32. His inventory of equipment and personal property owned by the companies totaled $2,068.624. Pet. Exhibit 19. At this hearing, Mr. Waller testified that his personal financial statement was "a best case scenario" but if he were forced to sell, he believed that after paying the auction broker, the assets would bring in 35-40% of their listed 'best-case scenario' value when liquidated. After paying debt and taxes, he believed he would have a shortfall.

15. Mr. Waller presently owes People's Bank $654,682. The loan is secured by collateral including the marital home at 1712 Oakmont Street, Lawrence, Kansas, and industrial property at 3196 Highway K 68, Ottawa, Kansas. Furthermore, the collateral includes a security interest in all accounts, monies, contract rights, chattel paper, instruments, deposit accounts, inventory, machinery, furniture, fixtures, tools, parts, and other equipment. Resp. Exhibit 5. Mr. Waller owes Daimler $105,256.00 on trucks purchased for his company. Mr. Waller and Stage Pro Mobile owe Bank of America $486,479.00. For some unexplained reason Mr. Waller has pledged his business assets as cross-collateral to these banks. Bank of America also has its loans secured by a security interest in the same commercial property, the machinery, accounts, accounts receivable, and other business assets. Mr. Waller also had tax liens totaling $163,985.68: for personal property tax; employee federal tax (941) on Stage Pro Inc.; federal income tax on Stage Pro Inc.; Kansas retail tax on Stage Pro Inc.; and Kansas compensating use tax. Pet. Exhibit 24. Resp. Exhibit 1, 3, 4.

16. Stage Pro, Inc.'s balance sneet for 2010 lists its assets valued at $2,068.624.00, with a lien of $320,735.00. It lists retained earnings as $304,760.00. It shows accounts receivable as $133,633.00. Stage Pro Mobile lists its fair market value of equipment at $1,021,003.00 in the 2010 balance sheet. It has a lien of $486,479.00 and lists its retained earnings as $125,608.00. It shows accounts receivable as $76,110.00. Those retained earnings add up to $430,368.00. Pet. Exhibit 1. The Court understood retained earnings to be earnings reinvested in the business to purchase assets or used to reduce liabilities, as in to pay debt. Mr. Waller testified that it was simply an accounting adjustment; i.e., he did not have cash and he did not pay down debt or buy any assets in any substantial way.

17. Mr. Waller also runs his business largely on credit cards. (His former line of credit was cut and the amount owed is included in the Bank of America lien). He owed Bosch Security $42,383.33 as of January 27, 2011. He owed Bank of America $9,447.52 on one credit card account and $8,021.88 on another card. He owed Home Depot $2,641.69. He owed John Deere $1952.40. He owed Sony Card $4,164.28. He owed Diners Club $29,335.68. He owed American Express $11,238.59. Resp. Exhibits 7-15. This totals $109,185.37. Mr. Waller also presented other bills allegedly owing to vendors but the bills were not up to date and are not considered.

18. In short, the People's Bank loan, The Bank of America loan, the Daimler loan, credit card debt, and tax liens total $1,509,587.00. Mr. Waller listed his assets and

5

companies' assets at approximately $3,500,000.00 when he applied in 2010 for a bank loan. Deborah Drummett, an assistant vice president at Capital City Bank, testified that at the time the People's Bank loan was made to Mr. Waller in 2009, his collateral value was estimated to be $2,480,916, with the real estate was appraised at $650,000. The loan to value rate was 26.2%. Ms. Drummett also admitted that current market values were terrible, and that new appraisals were needed to determine the present loan to value rate. Even at the more conservative value of $2,480,916.00 after subtracting known debt, Mr. Waller still had assets.

19. Ms. Waller testified that she borrowed $40,000.00 from her parents for attorneys fees in this case. Restraining orders to preserve the property were violated by Mr. Waller, and numerous motions to compel discovery were brought. Mr. Waller produced more documents and more information at each court appearance, including the names of lawyers and accountants he had never identified before these motions and hearings. As stated, he never produced all the financial records as stated above.

20. Mr. Waller admitted that he had a number of bank accounts. Employees had debit cards to his main account, and their unexpected withdrawals could cause checks to bounce which caused him to open another account for his employees' debit card use. Mr. Waller also opened additional bank accounts because the government levied tax liens on accounts. He testified that he opened new accounts to evade the liens and keep the businesses operating. Mr. Waller testified that his company was current on federal employment taxes and had reduced the 941 tax lien substantially in 2011.

21. Mr. Waller had a motorcoach RV bus, which he rented out to bands to generate income. That was owned free and clear, with 3 to 5 years useful life left. Mr. Waller estimated that the sale price would be $100,000 to $110,000. The bus served as collateral to the People's Bank and Bank of America loans.

22. The parties have divided their household goods and furnishings.

23. Petitioner requests that Respondent pay $10,297.50 in fees and costs, due to failure to provide timely discovery, failure to provide bank statements, and failure to provide business records for 2006-2008, despite both motions to compel and a court order to do so. Petitioner asks for 35 hours attorney time, plus bank fees of $950 (service fee and costs of copying), accounting fees of $2,500.00.

*Conclusions*

1. The court has jurisdiction over the parties and the subject matter of this action. The parties are irreconcilably incompatible and are granted a divorce on that ground.

2. The court has the option of ordering that the business be sold or its assets liquidated, but neither party requested that outcome. Finding a potential buyer is unlikely, given the debt and liens the companies face. Mr. Waller believes his companies could possibly find themselves owing monies if a sale of assets were forced, after taxes

6

Case 14-06023   Doc# 19-3   Filed 06/16/14   Page 6 of 10

and sale costs were subtracted. However, the equipment still has a useful life, and in the best-case scenario it is possible that a buyer could be found in the marketplace who could pay the value of that future useful life (what the Respondent calls the equipment's "eBay prices") But the overall debt load is high, and bankruptcy may yet loom in the future, especially since Mr. Waller and his companies have poor credit ratings yet rely upon credit for day-to-day operations. If credit tightens in the near future, Mr. Waller may find himself and his businesses at a standstill, at which point his creditor banks may call their loans due or Mr. Waller may find himself in bankruptcy. Nonetheless, according to Mr. Waller, the company in 2011 has made substantial inroads on tax liens and still generates sizeable revenues. It is possible that the financial situation will improve. The business still has assets variously valued at $3.3 million by Mr. Waller or by the bank at $2.5 million.

3. At the close of this trial, Ms. Waller requested that certain assets which are not strictly needed for the businesses' operation be awarded to her, such as the Franklin County real estate acreage, excepting the buildings used by StagePro in its day-to-day operations, and the RV bus. The real estate is subject to a mortgage note. Furthermore, these identified assets have two banks with security interests prior to any claim by her, even if the assets were awarded to her. In the event that the banks call their loans due, it is unlikely that the banks will forego their claims on assets of real estate (valued conservatively at $380,000 or as high as $700,000) or personal property valued at more than $100,000.00. In the short term, Ms. Waller is not free to sell those assets without approval by senior creditors. The Court declines to follow this recommendation.

4. At the close of this trial, Mr. Waller's counsel stated that there are still business assets but argued the only way of knowing their true value in the current market would be to sell them. The assets are used and are necessary to generate business income. He proposed maintenance as a possible resolution. Ms. Waller dropped her request for maintenance at trial since she deemed any maintenance would be difficult to collect. Collecting will be difficult given Mr. Waller's track record, but all the assets of the business and of Mr. Waller are encumbered. Based upon the division of financial accounts and assets outlined below, maintenance is ordered in the amount of $1,000.00 a month for 60 months.

5. The marital residence at 1712 Oakmont in Lawrence is awarded to the husband, as his sole and separate property free and clear of any claim by the petitioner, subject to the indebtedness thereon. He shall be solely responsible for the first mortgage and the collateral notes. Mr. Waller is already in possession of the premises and is currently paying the mortgage on the residence. He shall take all necessary steps to remove Ms. Waller from any notes or mortgages within six months of this decision. In the event Mr. Waller cannot or does not remove Ms. Waller from the obligation, then the realty shall be placed on the market for sale. Any proceeds will be applied to Mr. Waller's loans and guarantees. The court does credit Mr. Waller with $17,000.00, for the down payment of the marital residence. The hot tub at issue in this divorce will remain with the marital residence.

7

6. The commercial property used by StagePro in Ottawa, Kansas is awarded to Mr. Waller. Ms. Waller is not obligated on the commercial mortgage or notes.

7. Mr. Waller shall continue to have sole ownership of his business entities, StagePro, Inc., StagePro Mobile Stages, LLC and APEX stages, Inc., business assets and business liabilities included. He shall indemnify and hold harmless Ms. Waller from any business debt, including tax liability.

8. The parties own two vehicles, a 2009 VW Jetta Compass, with equity of $2,325.00 and debt of approximately $15,000.00, and a 2008 VW Beetle Convertible, with equity of $4,150.00 and debt of approximately $12,000.00. The wife is assigned the VW Beetle vehicle, with its accompanying debt. The husband is assigned the VW Jetta, with its accompanying debt. The boat and trailer are awarded to the wife.

9. The timeshare in Orlando, Florida, known as "Vacation Villas at Fantasy World II" is assigned to wife. The Daytona Beach, Florida time share and the Las Vegas, Nevada timeshare are assigned to the husband. If there is any debt outstanding on each time share, the debt will run with the property interest.

10. All bank accounts, policies of life insurance and investments in wife's separate name are awarded to her, free and clear of any claim by the other.

11. Mr. Waller listed $5,000.00 in credit card debt in his individual name on the amended DRA. Ms. Waller listed $37,861.00 in credit card debt in her name. All credit card debt is assigned to Mr. Waller. He shall indemnify and hold Petitioner harmless therefrom.

Maintenance

12. <u>Temporary Maintenance.</u> Respondent was ordered to pay $1,116.00 a month, and has not paid anything in child support or maintenance. The court ordered that the American Funds be transferred to the Petitioner partially to satisfy the temporary maintenance. Respondent is given an offset credit for the December mortgage payment he made directly to the bank. Petitioner is granted judgment for all unpaid temporary maintenance through December 1, 2010, to May 31, 2011, with interest at the judgment rate beginning November 1, 2011. Petitioner's attorney shall submit an appropriate judgment order to the Court within 14 days of the date of this memorandum decision.

13. <u>Maintenance.</u> The Court awards maintenance in lieu of any value assigned to the businesses and their assets. As noted, the business assets are necessary to generate income or are encumbered. The Court awards $1000.00 a month for 60 months. Respondent shall pay maintenance in the sum of $1000.00 beginning December 1, 2011, and on the first (1st) day of each month thereafter for sixty (60) months. The maintenance shall terminate upon the death of either party, Petitioner's remarriage or her cohabitation in a marriage-like relationship with an adult.

8

### Attorney's Fees

14. Respondent never provided copies of many financial records to Petitioner or to the Court. Moreover, he refused to provide some of the partial records that he ultimately provided without a court order. Respondent appeared at each court hearing (motion to compel and motion for contempt) with more records than previously produced, even though he still fell short of reasonable requests and pleaded shoddy bookkeeping. Hence, it is reasonable to assess some cost of discovery in the case to him. The Petitioner has requested $6,847.50 in attorney fees, bank fees of $950.00 and accounting fees of $2,500.00. These fees cover the time from December 2010 to approximately two weeks before trial, or the time where discovery was overdue. The Court awards attorney fees of $3300.00 (12 x $275/hr.), and bank fees of $950.00. The accounting fees were necessary at some point for case preparation. The claimed hours were spent drafting the motion to compel production, the motion and affidavit for contempt, attending the hearings, drafting subpoenas for discovery from the banks when Respondent failed to produce the requested documents, and identifying missing documents. Some of the claimed costs were part of the normal give and take of discovery, and some review of produced documents was necessary to the case. However, Respondent flouted the rules repeatedly and must bear some of the costs of making him comply.

### Child Support

The Court, per Judge Shepherd, ordered child support at $850.00 per month, which was based upon 2009 tax earnings of approximately $84,000.00. Mr. Waller did not pay child support during the pendency of this divorce. Mr. Waller asserted that he was living on considerably less this year than in previous years (approximately $35,000 in 2011), and the child support amount was too high. The Court notes that Mr. Waller testified that he had paid off most federal tax liens in 2011, which would temporarily reduce his income. The Court also notes that he is permitted an income of $60,000.00 annually under the terms of the loan. Mr. Waller apparently benefits from petty cash withdrawals and personal expenses paid for by his business, so the Court adopts the $60,000.00 annual fee set by the bank. The Court has calculated a child support amount of $597.00 per month, which included a $1000.00 maintenance allowance, adjustments for health insurance and child care. That amount of child support will be retroactive to January 1, 2011.

In making this determination, the Court has taken into consideration the length of this marriage, the age of the parties, the property they own, their present and future earning capacities, and the time, source and manner of acquisition of their property. In these unpalatable circumstances, the Court considers this determination to be fair and equitable.

IT IS FURTHER ORDERED that pursuant to Kansas Supreme Court Administrative Order No. 154, all maintenance and child support payments shall be made payable and

9

Any payments not made in accordance with this provision shall be presumptively disallowed.

IT IS FURTHER OREDERED that the District Court Trust shall monitor and enforce the maintenance and child support orders and may pursue remedies available to the obligee to enforce the order for support.

IT IS FURTHER ORDERED that each party shall complete the Court Trustee Information Form providing the District Court Trustee with the party's name, social security number, address, and employer, including business address. Further, this form is to be updated within seven (7) days after any change in the party's name, address and employer, including business address. The District Court Trustee shall provide a copy of this completed form and all updates to the other party.

IT IS FURTHER ORDERED that the support order information sheet be completed and filed within fourteen (14) days of the date of this decision with the Clerk of the District Court pursuant to Kansas Supreme Court Administrative Order No. 154.

IT IS FURTHER ORDERED that withholding of income to enforce this order for support and any modifications shall take effect without further notice pursuant to K.S.A. 23-4107, and any amendments thereto.

Each party shall sign any documents necessary to promptly and efficiently effectuate the orders of the Court.

This memorandum decision constitutes a journal entry.

IT IS SO ORDERED this 17th day of October, 2011.

B. Kay Huff
District Judge

cc: Margie Wakefield
John Gerstle



10